**Gerald H. POPKIN, Plaintiff,**

v.

**NATIONAL BENEFIT LIFE INSURANCE COMPANY, Defendant.**

**No. 86 Civ. 4109 (WCC).**

United States District Court, S.D. New York.

April 27, 1989.

Burns & Levinson, Boston, Mass., Irving Levin, New York City, for plaintiff; John A. Donovan, Jr., Michael Weinberg, of counsel.

Kelley, Drye & Warren, New York City, for defendant; Jeffrey S. Cook, Neil Merkl, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Defendant National Benefit Life Insurance ("National Benefit") moves to dismiss the Complaint and for summary judgment pursuant to Rules 12 and 56, Fed.R.Civ.P. The motion is granted in part, and denied in part.

## BACKGROUND

In 1972, plaintiff Gerald H. Popkin ("Popkin") was asked by the Alumni Association of the University of Massachusetts at Amherst ("Amherst") to start a group life insurance program as a means of raising money to support its activities. Initially, Popkin and Amherst engaged Bankers Security Life Insurance Society as the group insurer.

When Amherst became dissatisfied with that insurer, Popkin met with Ralph Patton, and subsequently Larry Schwartz, vice presidents at National Benefit, to discuss the possibility of transferring Amherst's business to National Benefit. Popkin strongly recommended National Benefit's insurance program to Amherst. Amherst accepted the recommendation.

In 1978, three documents relating to National Benefit's underwriting of the Amherst group insurance program were drafted and executed. A letter agreement, executed by Amherst and National Benefit on February 23, 1978 (the "Underwriting Agreement"), purported to establish "the terms and conditions pursuant to which the University of Massachusetts Alumni Association ... and its members ... will participate in a program ... of life insurance sponsored by the [University of Massachusetts Alumni] Association and underwritten by [National Benefit]." Plaintiff's Exhibit 10. The Underwriting Agreement would be "construed and enforced as a contract under seal in accordance with the laws of the Commonwealth of Massachusetts." *Id.*

¶ 7. According to this agreement, the group insurance program could be "terminated by [Amherst] at anytime upon thirty days prior written notice to [National Benefit]." *Id.* ¶ 6. Amherst and National Benefit contemplated that they would develop and promote the group insurance program "through one or more licensed agents of [National Benefit] designated from time to time by [Amherst] upon the terms and conditions" set out in the Underwriting Agreement. *Id.* ¶ 1. The Underwriting Agreement would not "take effect" until "completion by [Amherst] of arrangements with the Agent satisfactory to [Amherst]." *Id.* ¶ 6.

These "arrangements" were made on the same day; Popkin and Amherst executed a letter agreement (the "Administrator Agreement") concerning the "terms and conditions under which [Popkin] will serve as agent and administrator with respect to the group life ... insurance policy ... and program ... to be underwritten by [National Benefit] and sponsored by [Amherst] for the benefit of its members." Plaintiff's Exhibit 12. Like the Underwriting Agreement, the Administrator Agreement would be "construed and enforced as a contract under seal in accordance with the laws of the Commonwealth of Massachusetts." *Id.* ¶ 9. Either party could terminate it "upon 12 months prior written notice." *Id.* ¶ 7. The Administrator Agreement did not "take effect" until "completion by [Amherst] of satisfactory arrangements with [National Benefit] relating to the [group insurance] program." *Id.* ¶ 9.

On April 20, 1978, Popkin and National Benefit executed a form agreement drafted by National Benefit entitled "General Agent's Group Insurance Commission Agreement" (the "Agency Agreement"), which authorized Popkin to solicit applications for group insurance in Massachusetts. Plaintiff's Exhibit 12. The agreement could be "terminated without cause by either party upon written notice." *Id.* § 4(A). It called for the application of New York law: "In all matters concerning the validity, interpretation, performance, effect or otherwise, of this Agreement, the laws

of the state of New York shall govern and be applicable. Any actions or proceedings instituted by the General Agent under this Agreement, with respect to any matters arising under or growing out of this Agreement, shall be brought and tried only in courts located in the county of New York, State of New York." *Id.* § 5(B).

Plaintiff alleges that up until May, 1980, Amherst was satisfied with both National Benefit and Popkin. After that time, a dispute arose between Amherst and National Benefit over "rate credit" calculations. As a result, Amherst began looking at other group plans to see what dividend income benefits they were offering. On October 19, 1982, Amherst decided to transfer their group life insurance program to another insurance carrier. On November 30, 1982, it sent Popkin a notice of termination.

On September 21, 1984, Popkin brought a Massachusetts state action against National Benefit. National Benefit removed the action to federal court on October 23, 1984, and moved to dismiss on the ground that venue was improper, since Popkin's contract with National Benefit specified that any action brought by Popkin "with respect to any matters arising under or growing out of this Agreement, shall be brought and tried only in courts located in the county of New York, State of New York." Plaintiff's Exhibit 12 § 5(B). The parties agreed at oral argument that the motion should be treated as one for summary judgment, and, on December 31, 1985, the Massachusetts district court dismissed the action "without prejudice to further litigation in the courts of New York." Plaintiff's Exhibit 4 at 5.

Plaintiff brought this action on May 23, 1986. He alleges seven causes of action: (1) negligence; (2) breach of contract; (3) fraud; (4) misrepresentation; (5) unfair or deceptive trade practices within the meaning of Mass.Ann.Laws ch. 93A § 2(a) (Law Co-op 1985); (6) damage to business reputation; and (7) interference with contractual relations.

## DISCUSSION

Defendant asks this Court to dismiss the entire Complaint on the grounds that (1) four of the causes of action are barred by the statute of limitations; and (2) each cause of action lacks merit. Defendant's arguments are addressed individually below.

### I. *The Statute of Limitations*

Defendant contends that four of plaintiff's causes of action (negligence, misrepresentation, damage to business reputation, and interference with contractual relations) are barred by a three-year statute of limitations. *See* N.Y.Civ.Prac.Law § 214(4) (McKinney Supp.1988).[1] According to defendant, these causes of action accrued, at the latest, when Popkin's contract was terminated by written notice on November 30, 1982. *See* Plaintiff's Exhibit 27. Plaintiff responds that the causes of action did not accrue until he was injured by the loss of Amherst's business. He contends that he did not receive the notice of termination until December 9, 1982, and that he was thus not discharged under the contract until December 9, 1983. *See* Plaintiff's Exhibit 12 ¶ 7 (under Administrator Agreement, either party could terminate "upon

---

**1.** A federal court sitting in diversity applies the statute of limitations applicable in the forum. *Guaranty Trust Co. v. York,* 326 U.S. 99, 112, 65 S.Ct. 1464, 1471, 89 L.Ed. 2079 (1945); *see Stafford v. International Harvester Co.,* 668 F.2d 142, 147 (2d Cir.1981). Under New York law, the statute of limitations is considered procedural, and therefore New York courts will apply their own statutes to actions brought in the state, unless the New York borrowing statute is triggered. *Loengard v. Santa Fe Industries, Inc.,* 573 F.Supp. 1355, 1359 (S.D.N.Y.1983); *see also Sun Oil Co. v. Wortman,* —— U.S. ——, 108 S.Ct. 2117, 2121, 100 L.Ed.2d 743 (1988) (a state may

constitutionally conclude that a statute of limitations is procedural for choice of law purposes). Where New York's borrowing statute applies to a foreign plaintiff's claim, the shorter of the forum or borrowed limitations period is used. N.Y.Civ.Prac.Law § 202 (McKinney 1972). Since I conclude that Popkin's tort actions are barred by the New York statute of limitations, I need not inquire as to whether the Massachusetts limitation period is longer. *See DeWeerth v. Baldinger,* 836 F.2d 103, 106 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988).

12 months prior written notice"). Alternatively, plaintiff contends that the limitations period was tolled by the action he brought in Massachusetts.

■ Popkin's first argument turns on whether the limitations period begins to run when the acts causing the injury occur or when the injury is suffered. I hold that plaintiff's tort claims accrued when the acts causing the injury occurred. "[I]n a negligence action without fraud," the limitation period set forth in Section 214(4) "ordinarily runs from the time of the commission of the wrong or injury." *Icelandic Airlines, Inc. v. Canadair, Ltd.*, 104 Misc. 2d 239, 244, 428 N.Y.S.2d 393, 397 (Sup.Ct. 1980).

Judge Sweet recently rejected the contention that, for the purposes of Section 214(4), a claim accrues when an injury is suffered. *Texas Eastern Transmission v. General Electric Co.*, 601 F.Supp. 627, 629 (S.D.N.Y.1985). He observed that the New York Court of Appeals in *Sears, Roebuck & Co. v. Enco Associates Inc.*, 43 N.Y.2d 389, 372 N.E.2d 555, 401 N.Y.S.2d 767 (1977), "began to run the tort statute of limitations from the date of contract, not the date of injury." *Texas Eastern*, 601 F.Supp. at 629. I agree with Judge Sweet, that the contention that "the tort statute should not begin to run until the date of injury.... does not square with" the Court of Appeals' decision in *Sears. Id.* The cases cited by plaintiff are inapposite. *See, e.g., Murphy v. St. Charles Hospital*, 35 A.D.2d 64, 66, 312 N.Y.S.2d 978, 980 (2d Dep't 1970) (malpractice). Plaintiff's claim against National Benefit was mature as of the time Popkin received the notice of termination from Amherst.

■ Plaintiff also contends that the statutory period was tolled by the Massachusetts action. First, Popkin argues that the Court should rely on N.Y.Civ.Prac.Law § 205(a) (McKinney Supp.1989)[2] despite the fact that it "may not be directly applicable." Plaintiff's Brief at 33. As defendant points out, however, Section 205(a) "has no application where the first action is brought in a sister state, whether the court be state or federal." N.Y.Civ.Prac.Law, practice commentary 205:2 (McKinney 1972) (Citing *Baker v. Commercial Travelers Mutual Accident Ass'n*, 3 A.D.2d 265, 161 N.Y.S.2d 332 (4th Dep't 1957)). It may be that the policy underlying this statute justifies extending its reach to actions commenced outside New York. Yet the merits of such an extension of the law are for the New York legislature to address, not for this Court.

■ Plaintiff also argues that defendant's conduct, in moving for dismissal for want of proper venue in Massachusetts, estops defendant from asserting the statute of limitations defense. A defendant will be estopped from raising the defense, if it made misrepresentations which induced the plaintiff to delay bringing suit. *Levinson Steel Co. v. Schiavone Construction Co.*, 637 F.Supp. 164, 167 (S.D.N.Y. 1986). Popkin, however, did not rely on any statements made by defendant. He relied to his detriment on the representation of the Massachusetts district court that the dismissal was "without prejudice to further litigation in the courts of New York." Plaintiff's Exhibit 4 at 5. Popkins's attorney should have known that, even though a case is dismissed without prejudice, any new action brought must be timely. *See M.W. Zack Metal v. International Navigation Corp. of Monrovia*, 675 F.2d 525, 528–29 (2d Cir.) (statute of limitations defense not barred by fact that earlier case was dismissed "without prejudice"), *cert. denied*, 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 604 (1982); *accord Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center*, 721 F.2d 68, 77 (3d

**2.** The statute provides in pertinent part:
> If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or if he dies, and the cause of action survives, his executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the action would have been timely commenced at the time of commencement of the prior action.

Cir.1983) (dictum: "It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice. As regards the statute of limitations, the original complaint is treated as if it never existed."). Since defendant is not responsible for plaintiff's delay in bringing this action, there can be no estoppel.

I am at a loss to understand why Popkin did not ask the district judge in Massachusetts, if inclined to grant defendant's motion to dismiss, to consider transferring the case to this Court pursuant to 28 U.S.C. § 1404(a). A transfer would have avoided any difficulties with the statute of limitations, which had already run. Apparently, Popkin's attorney consented to the Massachusetts district court's treatment of the motion as one for summary judgment. Plaintiff's Exhibit 4 at 5. While there may only be a technical difference between a Section 1404(a) transfer and a dismissal by one federal court for lack of proper venue followed by refiling with the proper federal court, I am not persuaded that justice requires setting aside form for substance in this particular case. Counsel's failure to suggest a transfer only deprived plaintiff of four causes of action. Moreover, defendant's windfall was caused by plaintiff's counsel, not by defendant. As the Second Circuit observed in a somewhat analogous context:

> Unfortunately, it may be that plaintiff has a meritorious cause of action and will be denied his day in court. This does not, however, require reversal.... [I]f the attorney's conduct was substantially below what is reasonable under the circumstances, the client's remedy is a suit for malpractice.

*Schwarz v. United States,* 384 F.2d 833, 835 (2d Cir.1967) (discussing Fed.R.Civ.P. 60(b)(1)).[3] Plaintiff's claims for negligence, misrepresentation, damage to business reputation, and interference with contractual relations are dismissed.

---

**3.** Another course of action which might still be open to plaintiff would be to persuade the Mas-

## II. *The Merits of Plaintiff's Claims*

Defendant also contends that plaintiff's claims are meritless, and should be dismissed. I need not reach the merits of the claims dismissed as untimely. The merits of the remaining three claims are discussed below.

### a. *Unfair or Deceptive Trade Practices*

Plaintiff alleges that defendant engaged in "unfair or deceptive" trade practices within the meaning of Section 2(a), Mass. Ann.Laws ch. 93A (Law. Co-op 1985). That statute provides that: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The phrase "unfair or deceptive acts or practices" has been broadly construed by Massachusetts courts:

> What is unfair is a definitional problem of long standing, which statutory draftsmen have prudently avoided.... The criteria adopted in our decisions.... require us in a case such as this to look for conduct which is (1) within "at least the penumbra of some commonlaw, statutory, or other established concept of unfairness; (2) ... is immoral, unethical, oppressive, or unscrupulous ..."

*Levings v. Forbes & Wallace, Inc.,* 8 Mass. App.Ct. 498, 396 N.E.2d 149, 153 (1979). It is well established, for example, that a "misrepresentation in the common law sense would ... be the basis for a c. 93 claim." *Id.* 396 N.E.2d at 154. Popkin's claim is partly grounded on a misrepresentation theory; he alleges that his business interests were injured as a result of misrepresentations made by National Benefit to Amherst. *See International Fidelity Insurance Co. v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308, 1314 (1983) ("plaintiff must show ... a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception").

A private cause of action is provided for in Section 11 of Chapter 93A:

---

sachusetts district court to modify its judgment.

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court....

Mass.Ann.Laws ch. 93A § 11 (Law. Co-op Supp.1989). The private cause of action, however, is limited to claims arising out of Massachusetts transactions: "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]." *Id.*

Defendant contends that Chapter 93A is inapplicable on two grounds: (1) the Agency Agreement between Popkin and National Benefit provides that all disputes concerning that agreement are to be resolved under New York law; and (2) the alleged unfair practices did not occur "primarily and substantially" within Massachusetts.[4]

■ Defendant first maintains that plaintiff's claim under Chapter 93A is inconsistent with the choice-of-law provision in the Agency Agreement and the dismissal of Popkin's Massachusetts suit. The Agency Agreement provides that:

In all matters concerning the validity, interpretation, performance, effect or otherwise, of this Agreement, the laws of the state of New York shall govern and be applicable. Any actions or proceedings instituted by the General Agent under this Agreement, with respect to any matters arising under or growing out of this Agreement, shall be brought and

tried only in courts located in the county of New York, State of New York.

Plaintiff's Exhibit 12 § 5(B). I am not persuaded that Section 5(B) of the Agency Agreement prevents Popkin from alleging a cause of action under Massachusetts law where the claim does not concern "the validity, interpretation, performance, effect or otherwise" of the Agency Agreement. *Id.* Moreover, the forum selection clause in Section 5(B) construed by the Massachusetts district court is much broader than the choice-of-law clause in that Section. While the former refers to "any matters arising under or growing out of this Agreement," the latter only concerns claims for breach of contract. *Id.* I am not persuaded that Popkin's claim alleging unfair trade practices is a matter "concerning the validity, interpretation, performance, [or] effect" of the Agency Agreement. I therefore reject defendant's assertion that the Chapter 93A claim is inconsistent with the Agency Agreement.

■ Defendant also contends that the alleged unfair or deceptive practices did not occur "primarily and substantially" within Massachusetts. Mass.Ann.Laws ch. 93A § 11 (Law. Co-op Supp.1989). Plaintiff replies that defendant has the "burden of proof" on this issue, *id.*, and that defendant has failed to demonstrate that "there is no genuine issue" as to this "material fact." *See* Fed.R.Civ.P. 56(c); *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). After "resolving ambiguities and drawing reasonable inferences against" National Benefit, *Knight,* 804 F.2d at 11, I conclude that Popkin is correct; the evidence on this question "presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

---

4. I have assumed, without deciding, that New York's choice of law rules, which I must follow under *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), permit me to apply Massachusetts law to Popkin's unfair trade practices claim. Defendant only contends that the Agency Agreement and the terms of Chapter 93A prohibit the application of Massachusetts law. Since National Benefit does not challenge the applicability of Massachusetts law on other grounds, I need not determine whether Massachusetts law would be held applicable under New York's choice of law rules at this time.

"The meaning of the phrase 'primarily and substantially' is not well-defined by case law." *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1371 (D.Mass.1983), *aff'd*, 740 F.2d 59 (1st Cir.1984). Moreover, [t]here is no legislative history that serves as an aid to the construction" of the statutory exemption. *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 672 n. 11 (1985). The leading cases interpreting this provision are *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 441, N.E.2d 1027 (1982), and *Bushkin.*

The *Burnham* plaintiff claimed that the out-of-state defendant acted "unfairly" by delivering defective modular homes to the plaintiff in Massachusetts. The court concluded that the actionable conduct occurred "entirely" in Massachusetts, since the "sales of the plaintiffs' units could not have been completed until delivery and installation had taken place." *Burnham*, 441 N.E.2d at 1031–32.

In *Bushkin*, a New York investment banker claimed that, after he suggested a potential target to the Massachusetts defendant, the defendant feigned lack of interest, and attempted the takeover through another investment bank. The court held that, without more, misrepresentations made during telephone calls between Massachusetts and a sister state are not actionable under Chapter 93A: "The telephone conversations were between New York and Massachusetts. The alleged unfair or deceptive acts or practices were statements made in Massachusetts but received and acted on in New York. Any loss incurred in New York." *Bushkin*, 473 N.E.2d at 672. "[T]he decision in *Bushkin* flowed from the scantiness of activity in Massachusetts, including sustaining of the loss." *Makino, U.S.A. v. Metlife Capital Credit*, 25 Mass.App.Ct. 302, 518 N.E.2d 519, 524 (1988).

A more "functional" approach, which "responds to the statutory concern with commercial conduct in Massachusetts," was used recently by a lower Massachusetts court. *Makino*, 518 N.E.2d at 524. The court found that "the preponderance of the wrongful conduct occurred in Massachusetts and that the essential elements of the transaction—the sales, the financing deal, and the delivery of the machine—took place in Massachusetts." *Id.*

Popkin has proffered evidence that the alleged wrong occurred in Massachusetts. Admittedly, the calculations which produced the allegedly misleading rate credit were made in National Benefit's New York office. Popkin's claim, however, stems from the fact that these inaccurate calculations were communicated to Amherst in Massachusetts. Plaintiff's Exhibits 39 & 40. Therefore, for the purposes of Chapter 93A, the actionable conduct occurred "entirely" in Massachusetts. *See Burnham*, 441 N.E.2d at 1032.

Moreover, the transaction that allegedly resulted in Popkin's loss was inextricably tied to Massachusetts. National Benefit agreed to provide insurance for an alumni association based in that state. Its agent, Popkin, was based in Boston. While Popkin traveled on a number of occasions to National Benefit's home office in New York, Larry Schwartz, a vice president of National Benefit, apparently visited Popkin in Massachusetts, where Schwartz allegedly made misrepresentations regarding the rate credit, *see* Plaintiff's Brief at 40; Plaintiff's Exhibit 1 at 434, and the Underwriting Agreement (which contains the rate credit formula) was negotiated and drafted in Boston, Plaintiff's Exhibit 1 at 157–58 & 436. Finally, Massachusetts is the place where Popkin's alleged injury occurred. Defendant's Brief at 20; *see also Bushkin*, 473 N.E.2d at 672 (court observed that deceptive statements made on telephone in Massachusetts were "received and acted on in New York").

■ Defendant places much emphasis on the fact that the only contract between Popkin and National Benefit, the Agency Agreement, was drafted in New York and is to be interpreted according to New York law. Popkin's Chapter 93A claim, however, is not based on breach of contract. Popkin maintains that he was injured as a result of misrepresentations made by National Benefit to Amherst in the course of

National Benefit's performance of the Underwriting Agreement. Since Popkin's claim sounds in tort, it is irrelevant that he was not a party to the Underwriting Agreement. *Chestnut Hill Development Corp. v. Otis Elevator Co.*, 653 F.Supp. 927, 933 (D.Mass.1987) (no requirement that parties be in privity before their actions come within Chapter 93A).

The evidence proffered by Popkin demonstrates that there is at least a question of material fact as to whether the alleged deceptions occurred "primarily and substantially" in Massachusetts. Defendant's motion for summary judgment on Popkin's Chapter 93A claim is therefore denied.

### b.  Breach of Contract

Plaintiff alleges that National Benefit breached three implied covenants of the Agency Agreement: (1) the implied duty of good faith and fair dealing; (2) the implied covenant not to do anything that would thwart the effectiveness of the agency; and (3) the implied obligation to refrain from interfering with the agent's work.[5] Defendant replies that National Benefit had no obligation to maintain a contract with Amherst. I disagree.

An "agency" is a fiduciary relationship. *Ahn v. Rooney, Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985). Parties to an agency contract, like those in ordinary contracts, must act in good faith and deal fairly with each other. *D.S. Magazines, Inc. v. Warner Publisher Services* 640 F.Supp. 1194, 1203 n. 36 (S.D.N.Y.1986) (Weinfeld, J.). A corollary to "the implied covenant of good faith and fair dealing," is the obligation of each party to avoid "engaging in conduct that will deprive the other party of the benefits of their agree-

ment." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980). Good faith may also require that affirmative steps be taken to assure the success of a cooperative effort. Where one party's financial gain depends on the other's efforts, courts will imply a promise to use "reasonable efforts" to further the venture, since "[w]e are not to suppose that one party was to be placed at the mercy of the other." *Wood v. Lady Duff-Gordon*, 222 N.Y. 88, 90–91, 118 N.E. 214, 214 (1917) (Cardozo, J.). Without an implied promise to use reasonable efforts, a "transaction cannot have such business 'efficacy as both parties must have intended that at all events it should have.' " *Id.* at 91, 118 N.E. at 214–15.

The obligation of good faith is mutual. The agent must use his best efforts to promote the interests of the principal. *Cristallina S.A. v. Christie, Manson & Woods*, 117 A.D.2d 284, 293, 502 N.Y.S.2d 165 (1st Dep't 1986). The principal must reciprocate with the same measure of cooperation. "If the compensation of the agent is dependent upon his accomplishment of a result and the result can be accomplished only if the principal cooperates, the principal's promise to give such cooperation is inferred unless there are manifestations to the contrary." Restatement (Second) of Agency § 433 comment b (1958). The principal cannot by act or omission "thwart the effectiveness of the agency." 3 N.Y.Jur.2d *Agency and Independent Contractors* § 217 (1980); *Sidella Export–Import Corp. v. Rosen*, 273 A.D. 490, 492, 78 N.Y. S.2d 155, 157 (1st Dep't 1948) (per curiam). Nor can he unreasonably interfere with the agent's work. Restatement (Second) of Agency § 434 (1958). Finally, he must avoid "conduct towards third persons [that]

---

**5.** National Benefit points out that "[p]laintiff has not attempted to claim third party beneficiary status [with respect to the Underwriting Agreement]; he did not plead it . . ., and, he has not claimed it in his memorandum. The reason is simple; there is no evidence that the [Underwriting] Agreement was intended to benefit the plaintiff." Defendant's Reply Brief at 20. It is true that Popkin has not pleaded third party beneficiary status. Yet I disagree with defendant's conclusion that the facts would not support the inference that Popkin was an intended

beneficiary of the Underwriting Agreement. A jury might reasonably imply such an intent from the Underwriting Agreement's references to an "agent." Plaintiff's Exhibit 10 ¶ 1 (group insurance program would be promoted "through one or more licensed agents of [National Benefit] designated from time to time by [Amherst]") & ¶ 6 (Underwriting Agreement would not "take effect" until "completion by [Amherst] of arrangements with the Agent satisfactory to [Amherst]").

prevents the accomplishment of the work by the agent," *id.* comment a, "harm[s] the agent's reputation[,] or make[s] it impossible for the agent to continue in the employment," 3 N.Y.Jur.2d *Agency and Independent Contractors* § 217 (1980).

Yet conduct on the part of the principal that does not rise to the level of bad faith, intentional interference or lack of cooperation does not breach an implied obligation of the agency contract. As long as the principal is cooperative and honest in his dealings with the agent, the agent cannot complain of the manner in which the principal's business is conducted, even if commissions are lost as a result of the principal's inefficient operations. "Unless the contract of employment requires the furnishing of articles of specified quality, or the conducting of the business in a particular manner, the principal is under no duty to conduct his business in a skilful manner or to supply materials of such quality and at such price that the agent will be able to make substantial sums in commissions." Restatement (Second) of Agency § 433 comment e.

█ In light of these principles, defendant's assertion, that National Benefit had no obligation to maintain its business with Amherst, misses the point. A jury may conclude that the Underwriting Agreement, the Administrator Agreement, and the Agency Agreement should be read together as one transaction, and that each agreement is contingent on the others. *See* Plaintiff's 3(g) Statement ¶¶ 6, 8 & 11. After hearing all the evidence, a jury may find that National Benefit dishonestly misrepresented the rate credit to Popkin, *see* Restatement (Second) of Agency § 435 (duty to give agent information), or otherwise improperly failed to cooperate or intentionally interfered with Popkin's attempt to keep the Amherst business.

Defendant has failed to demonstrate that "there is no genuine issue" as to whether National Benefit met its obligations implied by New York agency law. *See Knight*, 804

F.2d at 11. National Benefit's request for summary judgment on the contract cause of action is therefore denied.

#### c. Fraud

Plaintiff alleges that defendant defrauded him by intentionally misrepresenting the rate credit. Defendant replies that (1) the fraud claim is merely a meritless breach of contract claim; (2) plaintiff has not proffered evidence of scienter or reliance; and (3) plaintiff has failed to plead fraud with particularity.

The Complaint alleges that from 1980 through 1983, National Benefit "with intent to deceive the Plaintiff as agent of record and administrator, represented to the Plaintiff that the Alumni Association had incurred certain charges which reduced or eliminated the rate credit dividend due to the Alumni Association." Complaint ¶ 23. It charges that these representations "were false in fact and known to be false by the Defendant at the time they were made." *Id.* ¶ 24. National Benefit allegedly made these false statements "in an effort to deprive the Alumni Association of funds properly belonging to it." *Id.* Popkin claims that because he "relied" on National Benefit's representations, he communicated them to Amherst, *Id.* ¶ 25, and, as a result, "lost and continues to lose substantial income in·connection with the Alumni Association program, good will, substantial insurance business, and his good reputation as an insurance agent." *Id.* ¶ 26.

An action for fraud must involve more than a party's failure to perform a contract as promised. *See Vanderburgh v. Porter Sheet Metal*, 86 A.D.2d 688, 688–89, 446 N.Y.S.2d 523, 525 (3d Dep't 1982) ("failure to perform promises of future acts is a breach of contract not fraud"); *accord Chedd–Angier Production Co. v. Omni Publications Int'l*, 756 F.2d 930, 939 (1st Cir.1985); *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867, 868 (1963).[6] The rationale behind this rule is that a fraud action cannot be "based upon

---

**6.** Since plaintiff's fraud claim would survive this motion for summary judgment under either New York or Massachusetts law, there is no need to resolve the choice-of-law question at this time.

1204

a statement of future intentions, promises or expectations which were speculative, or expression of hope at the time when made, rather than misrepresentation of fact." *Tutak v. Tutak*, 123 A.D.2d 758, 760, 507 N.Y.S.2d 232, 233 (2d Dep't 1986). Fraud may be pleaded whenever a breach of contract is accompanied by a statement which falsely represents the declarant's state of mind. *Tribune Printing Co. Inc. v. 263, Ninth Avenue Realty, Inc.*, 57 N.Y.2d 1038, 1041, 444 N.E.2d 35, 35, 457 N.Y.S.2d 785, 785 (1982); *accord Barrett Associates*, 190 N.E.2d at 868. In such a case, the policies underlying both contract law and tort law are implicated. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898–99 (2d Cir.1980).

> [I]t does not follow that because acts constitute a breach of contract they cannot also give rise to liability in tort. Where the conduct alleged breaches a legal duty which exists "independent of contractual relations between the parties" a plaintiff may sue in tort.... If the only interest at stake is that of holding the defendant to a promise, courts have said that the plaintiff may not transmogrify the contract claim into one for tort.... But if in addition there is an interest in protecting the plaintiff from other kinds of harm, the plaintiff may recover in tort whether or not he has a valid claim for breach of contract.

*Id.* at 899.

Plaintiff alleges that after National Benefit entered into the contracts with Amherst and Popkin, it attempted to defraud Amherst out of some of the profits of the group insurance program by purposefully miscalculating the rate credit. While it may be that such conduct would constitute a breach of the Agency Agreement, it would certainly also be a tort; even if the Agency Agreement was void, the law would protect Popkin from the damage caused by such false statements. "[T]he law of frauds seeks to protect against injury those who rely to their detriment on the deliberately dishonest statements of another." *Id.*

Defendant's claim that plaintiff has not proffered sufficient evidence of intent must also be rejected. "Summary judgment is generally inappropriate when issues of motive, intent, and other subjective feelings and reactions are material." 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56. 17[41.2] (2d ed. 1988); *accord Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973); *Horwitz v. AGS Columbia Associates*, 700 F.Supp. 712, 722 (S.D.N.Y.1988). It is true that a plaintiff cannot simply avoid summary judgment by pleading a claim in which the defendant's state of mind is a material element. *Markowitz v. Republic National Bank*, 651 F.2d 825, 828 (2d Cir.1981). Yet, on a motion for summary judgment, all inferences must be drawn against the moving party, *Knight*, 804 F.2d at 11, and I am persuaded that a jury might reasonably infer that miscalculations of the rate credit, which improved National Benefit's profit margin, were intentional. Admittedly, National Benefit has submitted the affidavit of Gerard Michels, a National Benefit vice president who was involved in the calculations, which suggests that any errors were accidental. Michels Affidavit ¶ 14. A jury, however, would be entitled to disbelieve Michels' testimony. Moreover, plaintiff has proffered a memorandum prepared by National Benefit at the time the calculations were made which might be construed as evidence of sharp practices.[7] In sum, there is sufficient dispute concerning the scienter element of Popkin's fraud claim to preclude summary judgment.

Whether Popkin relied on National Benefit's representations regarding the rate credit is also an issue of fact. Defendant has offered Popkin's deposition testimony as evidence that Popkin was aware of the miscalculations, and therefore did not rely on them. Defendant's Exhibit 6 at 195, 209 & 219. The same deposition, however, con-

---

7. The memorandum documents communications between Gerard Michels and Bernard Isenberg, another National Benefit officer. Michels wrote: "As usual Gerry Popkin is looking for a payment. The bottom line, of course, makes this impossible." Isenberg answered: "I think Gerry Popkin would be satisfied if we could 'squeeze' out $2,000." Plaintiff's Exhibit ¶ 42.

tains statements which suggest that Popkin did not know the statements were false until after they were passed on to Amherst. *Id.* at 206 ("I [was] satisfied that on the numbers presented to us, the calculations were correct.... I had nothing to do with the National Benefit [sic] or the calculation of how it was arrived at."). Since a jury could reasonably resolve this conflict in plaintiff's favor, I cannot hold that there was no reliance as a matter of law.

■ Although defendant is not entitled to summary judgment on Popkin's fraud claim, the claim must nevertheless be dismissed due to plaintiff's failure to comply with Rule 9(b), Fed.R.Civ.P., which provides that "the circumstances constituting fraud ... shall be stated with particularity." In order to comply with this rule, the Complaint should detail the "certain charges which reduced or eliminated the rate credit dividend" due to Amherst. Complaint ¶ 23. Plaintiff's fraud claim is thus dismissed, with leave to file a second amended complaint by May 16, 1989.

CONCLUSION

For the reasons stated above, defendant's motion to dismiss and for summary judgment is granted in part and denied in part. Plaintiff's causes of action for negligence, misrepresentation, damage to business reputation, and interference with contractual relations are dismissed as untimely. Defendant's motion for summary judgment in its favor with respect to plaintiff's claims for unfair or deceptive trade practices, breach of contract, and fraud is denied. Plaintiff's fraud claim is dismissed for failure to comply with Rule 9(b), Fed.R.Civ.P., with leave to amend the Complaint by May 16, 1989.

SO ORDERED.