**AIH ACQUISITION CORP. LLC and Lincolnshire Management, Inc. Plaintiffs,**

v.

**ALASKA INDUSTRIAL HARDWARE, INC., Josef F. Boehm and Alaska Industrial Hardware Employee Stock Ownership Plan Defendants.**

**No. 02 Civ. 7939(RO).**

United States District Court,
S.D. New York.

March 3, 2004.

See, also, 2003 WL 21511921.

Sean F. O'Shea, Michael E. Petrella, Law Offices of Sean F. O'Shea, New York City, for Plaintiffs.

Robert D. Piliero, Piliero, Goldstein, Kogan & Mitchell, LLP, New York City, for Defendants.

*OPINION AND ORDER*

OWEN, District Judge.

In August 2001, plaintiff Lincolnshire Management created AIH Acquisition Corporation ("AIH Acquisition"), which it wholly owns, to purchase and hold Alaska Industrial Hardware ("AIH"), of Anchorage, Alaska. Lincolnshire, AIH Acquisition and AIH then entered into a commitment letter ("Commitment") expressing the parties' intent that "the Buyer and the Company, the Seller and its agent will exert every reasonable effort to negotiate and execute a definitive Agreement, in form and substance satisfactory to the respective parties and their attorneys." The Commitment also contemplated that "the transaction shall be subject to the execution and delivery of a definitive stock purchase agreement." Defendant Josef Boehm, an officer and the majority shareholder of AIH, personally initialed each page of the document.[1]

In the days that followed, all the parties in this case expended a great amount of time and resources and travel to fulfill their obligations under the Commitment to work out the fine details of the SPA. Throughout September and October of 2001, plaintiffs, at considerable expense, did their due diligence and by mid-Novem-

---

1. Harold Snow and Ronald Braley, lawyers in Seattle, Washington represented AIH and Boehm in connection with the sale of AIH to the plaintiffs. Vincent Coyle, another lawyer from Seattle, represented the plaintiff-buyers.

ber plaintiffs' consultant had issued its preliminary report. The parties exchanged numerous drafts of the SPA. The lawyers extensively reviewed and revised these drafts pursuant to their obligations under the Commitment. Over the next few months, they exchanged dozens of e-mails taking forward the SPA negotiations. As pleaded in paragraph 28 of the Amended Complaint, which I accept as fact,[2] on or about February 4, 2002, seller Boehm's lawyer Braley "informed plaintiffs' counsel that *Boehm* and the ESOP [the minority shareholder] *had reached an agreement on material issues between them.*" (emphasis supplied). Braley essentially confirmed this in an e-mail of February 20 to among others, fellow attorney Snow and Coyle, plaintiffs' lawyer, which reads in part:

> We recognize that John Hommel will not be back until the first week in March. We are hoping to work out all of the pieces between now and then. We are expecting to have Joe Boehm sign the Agreement early next week and attempt to close during the first week in March.

After all the above, on March 27, 2002, a significant day, the lawyers for the parties continued their exchange of e-mails. Plaintiffs' counsel Coyle sent a "revised SPA ... urg[ing] everyone to limit comments to essential matters." Within

hours, defendants' lawyer Braley responded: "I have read the changes.... Unless I am missing some point, they appear to conform to the substance of our conversations and seem acceptable to us." Shortly thereafter, Braley e-mailed "Looks like we're good to go" and followed up with two more e-mails urging Coyle to get something to "put under Joe's [Boehm's] nose," and then demanded, "Where is it? Hal [Snow] is going nuts." By 6:30 that evening, Coyle had complied and sent an e-mail to the parties distributing an execution copy of the agreement: "Attached is the final SPA. *Everyone, including the lawyers,* has stated it is final without qualification." [3] (emphasis supplied). Notably, defendants' counsel not only did *not* object to Coyle's characterization of the agreement as final, but to the contrary, defendants' counsel Braley indicated assent, replying, "It's off to Hal [Snow, Boehm's other lawyer]. Thanks." Braley acknowledged in an affidavit that he sent it on. Two days later, however, Boehm refused to sign, demanding more money (Boehm Answer ¶ 40).

Even in the face of this, the parties for both sides continued their efforts to close the deal. Plaintiffs, at Boehm's lawyers' insistence, even agreed to "sweeten the pot."[4] This built to the April 16, 2002

---

2. Boehm's Answer does not "deny" this allegation in paragraph 28 of the Complaint. Permitting this allegation to be deemed factually acceptable is that Boehm's filed Answer thereto reads: "Deny *knowledge or information sufficient to form a belief* regarding the allegations set forth in paragraph 28 of the First Amended Complaint." (emphasis supplied). Noting that most of the allegations of the Complaint were met in the Answer with the single word "Deny" it cannot be said that the use of "Deny *knowledge or information*" was inadvertent as to paragraph 28–nor, as is observed in footnote 4, *infra,* was it inadvertent as to paragraph 43 of the Answer, either. This is obviously a fudging by Boehm's lawyers who prepared his Answer, for all they

had to do to obtain knowledge or information in this subject was to pick up the phone and speak with their own client, and/or his former lawyers Braley and Snow and question them. Obviously, the only entitlement or justification for the use of this phraseology of response by a party is where the *other party is in sole possession of knowledge as to the facts alleged.* Accordingly, I deem the facts asserted in paragraph 28 of the Complaint which Boehm so evaded in the Answer to be admitted.

3. The use of the language *"Everyone,* including the lawyers ..."* in the e-mail necessarily includes Boehm.

4. Amended Compl. ¶ 43. These facts in Boehm's Answer are also *denied* on "informa-

gathering of almost all the major participants in Anchorage, Alaska at the Hotel Captain Cook. The presidents of plaintiffs Lincolnshire and AIH Acquisition flew in from New York and their lawyer flew from Seattle as did Boehm's lawyer Snow. They had preliminary discussions. Plaintiffs' complaint then states in detail at paragraph 45:

> The next day, on or about April 17, 2002, Plaintiffs' representatives went to Snow's office. Shortly after their arrival, Snow advised them that "Joe [Boehm] has accepted the deal." The parties then shook hands on the deal, and Plaintiffs proceeded to draft the revisions to the Stock Purchase Agreement, which Snow approved. Upon Snow's request, Plaintiffs executed the revised Agreement in his offices. Snow then stated that Boehm would sign the Agreement later that night after dinner or, at the latest, the next morning.

Boehm's Answer admits this by its continued fudging use of the "deny knowledge or information ..." device where the answer was available on a phone call.[5]

As mentioned, there was a big dinner, and Boehn specifically admits in his Answer (¶ 46) that he went to the dinner.[6] But the evening and the next day came-and-went without Boehm signing.

There is more than minimal support for Boehm's occasional highly bizarre behavior resulting from his penchant for the highly excessive use of alcohol,[7] for violence—evidenced in court papers regarding a woman he lived with over some years[8] and I note that a grand jury voted an indictment in Federal Court in Alaska in January 2004, Index No. A04–003CR, charging Boehm with an extensive two year conspiracy with others, they to furnish cocaine and crack to females under twenty-one to obtain sex with them. The foregoing is appropriate to consider as supportive evidence of Boehm's unpredictability and irresponsibility toward others as well as both the plaintiff buyer here, and his own lawyers in the transaction as well. It is significant that there has never, however, been any contention whatsoever by Boehm or his lawyers at any time that he is not normally competent and indeed, the facts to establish incompetence are way beyond even the highly distressing conduct from time-to-time which has support in the record here. *See, e.g., McKeon v. Van Slyck,*

---

tion and belief" but such could have been immediately obtained through a phone call to Snow and/or Braley, Boehm's own lawyers. And I note that the pleader of Boehm's Answer at paragraph 43 erroneously applies this denial to paragraph "42" of the Complaint, apparently intending it to be "43," for he had *already* denied "information and belief" as to "42" in the prior paragraph. I continue to note that if that were not so, and Boehm's counsel were to stick by the duplicate use of paragraph "42" of the Complaint in two successive paragraphs of Boehm's Answer (¶¶ 42 and 43), then paragraph "43" of the Complaint would stand completely *undenied* in the Answer–notwithstanding any fudging.

5. *See* Amended Compl. ¶ 45 and Answer ¶ 45.

6. Obviously, the pleader of Boehm's Answer spoke to Boehm about going to the dinner. One wonders why the pleader did not ask

Boehm about the events of the day as to which the Answer denies "knowledge or information ..." that was so devastatingly supportive of the plaintiffs' position, i.e.: "Joe [Boehm] has accepted the deal." The Court also speculates from the vacuity of defense submissions elsewhere on this subject the utter unlikeliness that Boehm was not told at the dinner that the plaintiffs had signed that afternoon and he would be given the contract that night or the next day to sign.

7. In the record before me is a conviction in 1985 for driving while intoxicated where in writing he admitted his guilt.

8. There are two applications to a court in 1988 and 1989 for protective orders by the woman in question, which were granted.

223 N.Y. 392, 119 N.E. 851, 852 (1918); *Feiden v. Tully,* 151 A.D.2d 889, 542 N.Y.S.2d 860, 862 (3d Dep't 1989). The farthest his lawyers have ever gone in this area is to tell plaintiff's lawyers that once an agreement has been reached, "... the matter is a question of when he signs and not if he signs."

Needless to say after all this, plaintiffs were outraged by Boehm's obstinate off-again-on-again position. In a letter dated April 22, 2002, counsel for the plaintiffs formally told Snow that they considered Boehm's failure to perform as a breach of the SPA, and admonished that legal consequences could follow. To this, tellingly, Boehm's lawyer Snow rather forthrightly responded, "Let her rip. *It's what I would do if I were in your shoes.*" (emphasis supplied). To this day, Boehm continues to refuse to sign or perform under the SPA.

■ There are several ways to map the path to the just and proper conclusion here. The first is agency. Attorneys Snow and Braley acted as Boehm's agents for the purpose of reaching a binding stock purchase agreement. An agency relationship requires that both the principal and the agents take affirmative steps to "assure the success of a cooperative effort." *Popkin v. National Benefit Life Ins.,* 711 F.Supp. 1194, 1202 (S.D.N.Y.1989). The burden is not solely on the agent. The principal, too, must use his best efforts to cooperate and "cannot by act or omission 'thwart the effectiveness of the agency.'" *Id.* (citation omitted). Moreover, a principal "must avoid 'conduct towards third persons [that] prevents the accomplishment of the work of the agent.'" *Id.* at 1203–03 (citation omitted). Thus, Boehm, who at least twice told his attorneys he was satisfied and there was a deal, may not defeat the efforts and good faith representations that his attorneys made in furtherance of the Commitment by capriciously refusing at the last instant to sign an agreement which all had agreed was in final form.

■ Another path to the appropriate conclusion here is the application of the doctrine of promissory estoppel as nullifying the requirement of the essentially ministerial act of Boehm signing the final agreed document. Thus, notwithstanding Boehm's refusal to sign the SPA, I find here the existence of a binding obligation on his part to sign under the doctrine of promissory estoppel, which promise Boehm has wrongfully flouted. Under New York Law,[9] promissory estoppel may be invoked where there is (1) a clear and unambiguous promise to sign; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance. *See Esquire Radio & Elec., Inc. v. Montgomery Ward & Co., Inc.,* 804 F.2d 787, 793 (2d Cir.1986). Where a plaintiff is successful in satisfying these elements, the Court has discretion to award relief "as justice requires." *See Merex A.G. v. Fairchild Weston Sys.,* Inc., 29 F.3d 821, 826 (2d Cir.1994).[10]

---

**9.** New York law is applicable under the Commitment by agreement of the parties.

**10.** I note that I earlier dismissed plaintiffs' *cause of action* based on promissory estoppel, this cause of action existing primarily only where there is no written contract (Opinion dated July 1, 2003). *See NCC Sunday Inserts, Inc. v. World Color Press, Inc.,* 759 F.Supp. 1004, 1011 (S.D.N.Y.1991). Here, the Court is applying the doctrine of promissory estoppel narrowly to Boehm's *obligation to sign the otherwise complete instrument to which he had agreed.* There is no conflict between the recognition of Boehm's obligation to sign and the terms of the written agreement. Thus, the application of the doctrine is properly "outside the contract." *See id.*

Certainly by April 17, 2002 when, after many, many thousands of dollars of expense to the plaintiffs from the original signing of the Commitment in August of 2001 for due diligence and financing and lawyers' time spent in reasonable reliance, which otherwise would be lost to one man's caprice, and Boehm's lawyers saying more than once that it was not a question of if, but when, and Boehm, without comment, attending the Anchorage dinner following such representations, where everyone was gathered, some from thousands of miles away, and had that day themselves signed, the requirements of promissory estoppel to sign and thus do appropriate justice are clearly met. There is therefore here a fully-written contract–a deal–the terms of which were complete and final being the instrument the plaintiffs signed in Anchorage on April 17, 2002 in Boehm's lawyer Snow's office, at Snow's request which Boehm had to have been told about by Snow on or before the dinner together with the statement he was to sign that evening or the next day. Accordingly, in the above circumstances it is a valid contract for the sale of AIH to AIH Acquisition even absent Boehm's signature, and it is so declared enforceable forthwith today.

So ordered.