Frederick W.A. KNIGHT,
Plaintiff-Appellant,

v.

U.S. FIRE INSURANCE COMPANY, Insurance Company of North America, Centennial Insurance Company, Reliance Insurance Company, Federal Insurance Company, Royal Insurance Company of America, Northwestern National Insurance Company, Highlands Insurance Company and Continental Insurance Company, Defendants-Appellees.

No. 55, Docket 86–7294.

United States Court of Appeals,
Second Circuit.

Argued Aug. 27, 1986.
Decided Oct. 22, 1986.

Mary L. Montgomery, New York City (Kirlin, Campbell & Keating, James J. Higgins, Donald Burke, Robert A. Milana, of counsel), for plaintiff-appellant.

Donald M. Waesche, New York City (Waesche, Sheinbaum & O'Regan, P.C., Louis P. Sheinbaum, Richard W. Stone, II, John R. Keough, III, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, CARDAMONE, Circuit Judge and KELLEHER, District Judge.*

FEINBERG, Chief Judge:

Frederick W.A. Knight appeals from an order of the United States District Court for the Southern District of New York, Constance Baker Motley, Ch. J., granting summary judgment to defendant insurance companies. Knight argues that summary judgment was inappropriate because several genuine issues of material fact remain unresolved. Upon review, we conclude that no such issues are present. Therefore, we affirm the holding of the district court.

## I. Facts

The relevant facts are as follows: Between 1976 and 1979, Knight purchased in Thailand 222 antique stone and bronze statues for approximately $65,000. In 1980, an appraiser hired by Knight valued the collection at $20,205,000. The same appraiser revised his estimate to $27,000,000 in April 1981 and then to $30,307,500 in September 1981, the month in which he died. The appraiser was to receive for his services 5%

---

* Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

of the proceeds from the eventual sale of the statues.

Meanwhile, Knight had transported the statuary from Thailand to Singapore. In February 1981, Knight obtained through the insurance brokerage firm of Hogg Robinson & Gardner Mountain (Marine) Ltd. (Hogg Robinson) coverage of $20,205,000 from London underwriters for shipment of the collection from Singapore to Holland. In May 1981, after receiving the first revised estimate from his appraiser, Knight requested and obtained through Hogg Robinson an additional $10,000,000 coverage for the voyage.

In June 1981, however, after the approximately $30 million risk had been placed, Robert Jensen, Knight's broker at Hogg Robinson, received two anonymous phone calls reporting that Knight was planning to perpetrate a fraud. Jensen conveyed this information to the lead London underwriters who, in response, ordered their own appraisal of the statuary. A few days later, Jensen sent a telex to Knight informing him that the underwriters had voided his policy because of his material nondisclosures and misrepresentations regarding his collection. Jensen stated in the telex that, based on their appraiser's inspection of some of the statues, the underwriters believed that the collection was "grossly overvalued and, in some, if not all cases, replicas.... The evidence currently available to underwriters suggests that the proper value of the consignment is nominal only (possibly approximately 1 pct of the value declared)."

In the spring of 1982, Knight again attempted to obtain insurance for the same statues, this time through a New York brokerage firm, H.E. Yerkes & Associates, Inc. Knight obtained $30 million of coverage with several American underwriters for a voyage from Singapore to France. However, the collection ultimately was not shipped and the policy lapsed.

In October 1982, Knight approached Yerkes & Associates to reinstate his $30 million of coverage, claiming that he was preparing to ship the statues to a purchaser in Greece. The brokers succeeded in placing $30,630,750 of risk for the voyage from Singapore to Greece with several American insurance companies. Many of these insurers had agreed to insure the earlier projected voyage from Singapore to France. These are the policies contested in this lawsuit. For convenience, we will refer to them hereafter as one policy (the New York policy).

In January 1983, the statues were loaded on board a vessel for the voyage from Singapore to Greece. On February 7, 1983, the ship sank in the Indian Ocean and the statues were lost.

After the loss of his statues, Knight attempted to collect on the insurance provided by defendant underwriters. Defendants refused and, instead, voided the New York policy *ab initio* because of Knight's alleged material nondisclosures and misrepresentations. Thereafter, Knight brought this lawsuit. Defendants moved for summary judgment before Judge Motley, and she granted the motion in a 16–page memorandum opinion. This appeal followed.

## II. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

Before rendering summary judgment, a court must also determine that any unresolved issues are not material to the outcome of the litigation. "[T]he mere existence of factual issues—where those issues are not material to the claims before the

court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. *Id.* Similarly, a "bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment." *Eastway*, 762 F.2d at 251.

Properly used, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). As the Supreme Court recently explained:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

It appears that in this circuit some litigants are reluctant to make full use of the summary judgment process because of their perception that this court is unsympathetic to such motions and frequently reverses grants of summary judgment. Whatever may have been the accuracy of this view in years gone by, it is decidedly inaccurate at the present time, as borne out by a recent study by the Second Circuit Committee on the Pretrial Phase of Civil Litigation, chaired by Professor Maurice Rosenberg. The Committee analyzed the published and unpublished decisions of the Second Circuit for the period from July 1, 1983 to June 30, 1985 and found that the affirmance rate on appeals from orders granting summary judgment was 79%.[1] Final Report of the Second Circuit Committee on the Pretrial Phase of Civil Litigation 16–17 (June 1986). Thus it is evident that grants of summary judgment are upheld on appeal in most cases. That figure is comparable to this circuit's 84% affirmance rate for appeals in civil cases generally. *Id.* The widespread misperception regarding the disposition of appeals of summary judgment may be due to the fact that reversals are much more likely to be reported in published opinions than affirmances, which frequently are disposed of by unpublished orders under our Local Rule § 0.23. *Id.* We hope that the Committee's study dispels the misperception so that litigants will not be deterred from making justifiable motions for summary judgment.

### III. Discussion

Judge Motley granted summary judgment for defendants in this case because Knight had failed to inform them of a material fact. After rejecting several alternative grounds for the voidance of the New York policy, Judge Motley ruled that Knight's nondisclosure of the prior London cancellation together with the cancelling underwriters' opinion that the statues were overvalued and inauthentic justified defendant underwriters' voidance of the policy *ab initio*. With respect to this nondisclosure, Judge Motley found that there was no genuine issue as to any material fact. Although Knight presents several challenges to Judge Motley's decision, his arguments center around two main issues: whether the omitted fact was material and

---

**1.** Of course, there are few, if any, appeals from orders denying summary judgment, since such orders ordinarily are not appealable.

whether the underwriters had knowledge of that fact.

## A.

In evaluating whether particular facts are material, we must turn to the substantive law governing marine insurance. It is well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith. *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir.1985). This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured. Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire. *Id.* The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material. *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir.1931). To be material, the fact must be "something which would have controlled the underwriter's decision" to accept the risk. *Id.* The assured's failure to meet this standard entitles the underwriter to void the policy *ab initio*. *Puritan Ins. Co.*, 779 F.2d at 870–71.

Knight contends, however, that an assured's duty to disclose a prior cancellation is not triggered where the cancellation was based on fictitious or false information. He relies on the testimony of Leslie J. Buglass, an expert in marine insurance, that false information cannot materially affect risk. Arguing that his prior cancellation was caused by anonymous phone calls that were entirely groundless and an inspection that was performed by an unqualified appraiser, Knight maintains that it was error for Judge Motley to dismiss his allegations as irrelevant and to grant summary judgment.

The fact of the prior cancellation and the stated reasons for the cancellation are not disputed. In light of these circumstances, Judge Motley stated:

[A]s a matter of indisputable fact a prior underwriter's voidance of a thirty million dollar insurance policy on antiquities of dubious origin on the grounds that the goods were "grossly over-valued" and inauthentic would have been material to any subsequent underwriter's decision to accept the risk.... No reasonable juror could conclude, under the facts of this case, that defendants would not have declined to embrace plaintiff's requested thirty million dollar policy had they known of the prior London cancellation and of the incriminating contents of the telex from the London broker—at least not without subsequent opportunity for defendants to make their own investigation and perhaps adjust ... the amount insured.

We see no reason to disturb Judge Motley's conclusion that the fact of the prior cancellation and the stated reasons therefor would have materially affected defendants' decision to provide the thirty million dollar coverage. Although Knight devotes a substantial portion of his briefs to arguing that the prior cancellation was unfounded, that issue does not affect the materiality of the admitted nondisclosure. Regardless of the justifiability of the prior cancellation, the fact remains that the cancellation occurred because the London underwriters believed that the statues were overvalued and inauthentic. A reasonable assured in Knight's position would know that other insurers providing virtually the same coverage for the same statues would not take on the risk or maintain the same premium without at least investigating the prior cancellation, if informed of it and the stated reasons therefor. Cf. *Solez v. Zurich General Accident & Liability Ins. Co.*, 54 F.2d 523, 526 (2d Cir.1931), cert. dismissed, 296 U.S. 668, 57 S.Ct. 756 (1932). We hold under these circumstances that the nondisclosure is material. Thus, the materiality of the nondisclosure does not depend on what an investigation would have revealed. The facts of this case illustrate the difficulty courts would face in

determining retrospectively what an investigation would have uncovered, when the goods have already been lost. Instead, the insurer should be afforded the opportunity to investigate prior to its acceptance of the risk. Accordingly, the assured is required to communicate the information to the insurer before the policy is issued, so that the insurer can decide for itself at that time whether to accept the risk. This obligation is not burdensome to the assured and it comports with the open disclosure required by the doctrine of *uberrimae fidei.*

Knight's claim that the prior cancellation was unwarranted does not alter this conclusion. We are told that the materiality of information that an assured reasonably believes to be untrue is an issue of first impression, and we will assume for present discussion that Knight's belief in this case is reasonable. Under Knight's view, an assured would be permitted to withhold an otherwise material fact such as cancellation whenever he reasonably believed the basis for the cancellation to be unjustified. Such an approach would unnecessarily complicate litigation over nondisclosure. Deciding whether the basis for the undisclosed prior cancellation was well-founded would become a mini-trial in itself. The sounder approach is to require an assured to communicate the information to the insurer before a policy is issued, so that the insurer can decide whether to accept the risk despite the prior cancellation. Arnould's Law of Marine Insurance and Average ¶ 653 (M. Mustill & J. Gilman 16th ed. 1981) (hereinafter Arnould's Marine Insurance). Thus courts would not have to divine what would have occurred had there been full disclosure.[2]

We have also considered Knight's argument that a cancellation of prior insurance may be concealed, based on British cases holding that it is not necessary to disclose a prior refusal by another marine insurer to write a policy. See, e.g., Container Transport Int'l, Inc. & Reliance Group, Inc. v.

Oceanus Mutual Underwriting Ass'n (Bermuda), 1982 2 Lloyd's L.R. 178, 190. This marine insurance rule is apparently "not followed" in other types of insurance. Arnould's Marine Insurance at ¶ 642 n. 75. The rule may be explainable by the unusual nature of marine risks, but seems anomalous in view of the doctrine that the parties to marine insurance must observe the highest degree of good faith. In any event, we are unpersuaded by the analogy. A refusal to write a policy is not the same as a cancellation, particularly when the latter resulted from the insurer's belief that the goods insured were overvalued and inauthentic.

Knight also argues that the materiality of a nondisclosure is a factual issue that can be decided only by a jury, because, he urges, live testimony is essential to such a determination. Judge Motley recognized that the materiality of a nondisclosure is a finding of fact that ordinarily is a jury question. In this case, though, since the only possible outcome as a matter of law, even if a trial had been conducted, is in favor of defendants, Judge Motley was correct in granting summary judgment. See *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984); *King v. Aetna Ins. Co.,* 54 F.2d 253, 255 (2d Cir.1931). Indeed, it is precisely under these kinds of circumstances that summary judgment serves salutary purposes.

### B.

■ Knight claims that another genuine issue is whether defendants had knowledge, either actual or constructive, of the prior cancellation and the reasons for the cancellation. Such knowledge would defeat defendants' claim that the prior cancellation was not disclosed. Judge Motley's decision does not address this issue. After reviewing the record, we conclude that, even though Knight could have made these legal arguments more clearly in the district

---

2. Knight has made a motion to expand the record with an affidavit, not submitted to the district court, concerning the source of the anonymous telephone calls. Since we have determined that the justifiability of the prior cancellation is not relevant to the outcome of this appeal, we deny the motion.

court, he did mention these basic contentions in his opposition to summary judgment. Accordingly, we will discuss the merits. Keeping in mind that we are reviewing a summary judgment, we consider the facts in a light most favorable to Knight. See *Quinn*, 613 F.2d at 442.

Knight argues that he was not required to disclose the prior cancellation to defendants because some of the underwriters who reinsured a portion of the New York policy were primary insurers of part of the cancelled London policy. But defendants are the primary insurers of the New York policy, not the reinsurers, and there is no indication of actual knowledge of the prior cancellation on their part except for Knight's speculations. Knight's obligation was to communicate material facts to the primary insurers since they issued his policy.

Knight also maintains that two defendants—Insurance Company of North America (INA) and Centennial Insurance Company (Centennial)—had actual knowledge because of their relationship with two underwriters of the London policy—Insurance Company of North America, UK (INA(UK)) and Atlantic Mutual. He alleges that such knowledge existed because INA and INA(UK) are both subsidiaries of the same parent corporation and Centennial is a subsidiary of Atlantic Mutual. Again Knight offers only speculation that the two New York underwriters communicated with the two respective London underwriters about his policy prior to the loss of the statues. Speculation by itself is not enough to defeat a motion for summary judgment. *Quarles*, 758 F.2d at 840. The other circumstances described by Knight to show actual knowledge are even more speculative and do not require discussion.

Knight's claim of constructive knowledge is based on his alleged disclosure to INA of some of the circumstances surrounding his acquisition of the statues and his prior attempts to obtain insurance. See *Luria Brothers & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1091 (2d Cir.1986). He argues that the other defendants regarded INA as the lead underwriter and that they learned of any information known to the leader. Knight disclosed information such as the "very moderate" purchase price, the illegal export of the statues out of Thailand, his desire to avoid the London insurance market, and an earlier attempt to obtain "$15,000,000 upwards" coverage for the collection. None of this information, however, relates to the cancelled London policy. In view of the high burden of disclosure on the assured in the field of marine insurance, we conclude that this information falls short of providing sufficient notice so as to shift the obligation to defendants to inquire about a prior cancellation. Closely related to the claim of constructive knowledge is Knight's argument that defendants have not fulfilled their own obligations under *uberrimae fidei*. See *Puritan Ins. Co.*, 779 F.2d at 870. He contends that they would have made inquiries and learned of the prior cancellation if they had been acting in the utmost good faith. Since the speculative assertions on which Knight relies do not establish a genuine issue with respect to any of these issues, these claims must fail.

## IV. Conclusion

We conclude that Judge Motley's grant of summary judgment was appropriate since Knight has not shown any genuine issue as to a material fact. The justifiability of the prior cancellation is not a material fact and defendants' knowledge of the prior cancellation is not a genuine issue. Therefore, we affirm Judge Motley's decision to grant summary judgment and to dismiss the case.