**AMERICAN PLASTIC EQUIPMENT, INC., Plaintiff–Appellant,**

v.

**CBS INC., Defendant–Appellee.**

**No. 1210, Docket 89–7180.**

United States Court of Appeals, Second Circuit.

Argued June 6, 1989.

Decided Sept. 28, 1989.

James David Jacobs (Rosen, Dainow & Jacobs, New York City, of counsel), for plaintiff-appellant.

Douglas P. Jacobs (Anthony M. Bongiorno, Ronald E. Guttman, New York City, of counsel), for defendant-appellee.

Before LUMBARD, FEINBERG and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

American Plastic Equipment, Inc. appeals from the judgment of the Southern District, which granted the summary judgment motion of the defendant CBS Inc. under Fed.R.Civ.P. 56 and dismissed American's complaint in its diversity suit against CBS for breach of contract, fraud and wrongful interference.

Judge Duffy found that American had not submitted evidence sufficient to show that American and CBS identified or agreed upon the specific property to be purchased by American. He also concluded, without giving the parties an opportunity to address the issue, that the alleged contract was unenforceable because of the absence of adequate writing under the Statute of Frauds. We believe that there were unresolved disputes concerning the material issue of which goods were to be sold to American by CBS. In addition, the parties should have been accorded the op-

portunity to address the issue of the application of the Statute of Frauds. Accordingly, we reverse and remand.

## I

Except where stated otherwise, the facts as they appear in depositions and affidavits submitted to the court are undisputed:

American is a Florida corporation based in Miami in the business of purchasing used molds and other tooling to lease and sell to plastic manufacturers. In early 1985, American learned that CBS was about to close its toy division. CBS had acquired a stable of toy products and had a large quantity of uniquely valuable molds.

After preliminary inquiries, in June 1985 Doug Sages, President of CBS Toys, told Jay Horowitz of American that CBS was interested in selling over 6,000 molds. Sages having left CBS, Bill Willenbrock took over the negotiations and invited Horowitz to visit the plant in Newark, New Jersey, which Horowitz did on several occasions in June, July and August. On the basis of a computer printout furnished by CBS that listed active and inactive molds, Horowitz made a bid on inactive molds. After further delay, Boyd Browne, the new President of CBS Toys, requested Horowitz to come to the CBS office in Secaucus, New Jersey.

Horowitz flew to Newark on November 22 and met in Secaucus with Browne, Vice–President Skip Marson and Arthur Taylor, a former CBS officer acting as a consultant for CBS. Browne offered Horowitz all of CBS's inactive molds for $300,000. Apparently no question was raised concerning what the parties meant by "active" and "inactive" molds, the classifications used in the computer printout. At that time, according to Willenbrock's deposition, CBS employees were using the terms as follows: "Active meant in the production line. Inactive meant it was not in the production line" or was not scheduled to be in a production line." After settling rights in intellectual property, records, advertising material, samples and delivery, Browne and Horowitz haggled over price. Browne insisted on $300,000, and Horowitz finally accepted the terms. According to Horowitz, Browne asserted that a deal had been made, and the two then shook hands.

On November 27, Horowitz sent Browne a letter, dated November 25, by overnight express service confirming the terms of the agreement. The cover letter expressed satisfaction that the two had "agreed on a first deal" at the prior meeting and stated:

> In accordance with our discussion, enclosed find a draft of what I believe to be the basis of our agreement. This was taken from my notes. Please review this against yours to see if it corresponds with your notes. If so, kindly sign and return. If not kindly repair, sign and return.

In the cover letter, Horowitz also stated that he was enclosing a deposit and "a copy of 'Schedule A' as supplied to us by Bill Willembrock [sic]." Below the signature line, the cover letter listed as enclosures the draft agreement, Schedule A and the deposit, among other things. The enclosed draft agreement stated that the molds "subject of [sic] this agreement are listed in 'Schedule A' attached, and others."[1] Though the deposit of $10,000 was undisputedly enclosed, there is disagreement as to Schedule A: CBS asserts that American never sent Schedule A; American maintains that it did send Schedule A in the November 25 letter or shortly thereafter.[2]

Browne never signed or returned Horowitz's draft. On December 6, Horowitz visited with Browne in Secaucus, and Browne orally promised to send Horowitz a writing clarifying which molds were active and which inactive. On December 12,

1. The draft agreement also stated: "In addition to those molds specified on 'Schedule A' attached, it is intended that this sale include all of those molds not at the above mentioned location [Newark, New Jersey], not currently being used by CBS but in other locations, such as, those molds owned by CBS at foreign manufacturers, and other locations."

2. We note that the record on appeal does not contain any copy of the Schedule A that Horowitz claims he sent to Browne, nor was any copy produced at Horowitz's deposition.

Browne sent Horowitz a "letter of intent," which did not list active and inactive molds but which did state that CBS would not be bound without both agreement on a specific list of inactive molds and CBS corporate approval. The letter of intent also stated: "This letter will have no binding effort [sic—effect] upon either party unless or until on or before December 20, 1985, the parties mutually agree upon the specific items to be included in 'Schedule A'."

Horowitz called and spoke with Marson in Browne's absence. Horowitz asked why the letter of intent failed to list active and inactive molds and why the letter added additional conditions. Marson assured Horowitz that the letter was a formality, that the list would be sent soon and that the agreement still stood. Horowitz then noted spelling and grammatical changes. On December 18, Horowitz received the corrected version of the letter of intent, which now stated that Schedule A would "be supplied by CBS." Horowitz again called Browne to ask where the list of molds was. Browne assured Horowitz that the list would be forthcoming and that CBS would act as if the list had been included in the corrected version of the letter of intent. On December 18, Horowitz signed and returned the letter of intent with a cover letter addressed to Browne stating, "I have received your letter of intent, the contents of which agrees [sic] with our discussions." On December 20, Browne also signed the letter of intent and sent a copy to Horowitz.

CBS never sent the list. On January 8, 1986, Browne told Horowitz on the telephone that CBS would sell the molds in question to the View–Master concern, which was originally a defendant in this action but has since settled and is not involved in this appeal. At Horowitz's request, he and Browne met again in Secaucus on January 9. At that meeting, which Horowitz secretly tape-recorded, Horowitz told Browne:

> We had a hand shake and we had a deal. We had the price and the terms of payment and an agreement. That which was not clear was a list of molds to be included and you had said to me, well

you have a list—which has been provided to you by Bill Willenbrock, that is what we have been speaking about, . . . .

Later in the conversation, when Horowitz asked Browne if the Chairman of View–Master was aware of the American–CBS deal of November 22, Browne responded: "CBS told me he was[.] I made him aware of it." Browne added, "... I called [the Chairman of View–Master] yesterday and said I had an agreement with American. . . ." Shortly thereafter, the following exchange took place:

> HOROWITZ: Yeah, and I certainly feel that we've cooperated in every respect and don't feel that we have been treated fairly by CBS—I think
>
> BROWNE: I understand that and I, you know, won't say that I approve or disapprove but understand I do understand where you are coming from—I do understand you know the scenario that you laid out is 100% right I mean it was just accurate to the penny, the way, the way you laid it out. But I mind—you know—we did not have a final list that was agreed upon—
>
> HOROWITZ: No, No you could have come in with a list of one mold, and said that this mold was $300,000[.]
>
> BROWNE: I thought a lot about it, but I didn't want to do that.
>
> HOROWITZ: No I understand that and you would have completed your obligation at that point but that is not what you had in mind that was not your intention neither was that mine—we did have an agreement and actually CBS is backing out of it. . . .

Browne returned American's deposit with a cover letter, dated January 9, 1986, that suggested American try to make a deal with View–Master. No deal was ever made.

On August 22, 1986, American commenced this action against CBS, a New York corporation, and View–Master, an Oregon corporation. Against CBS, American claimed breach of contract, fraud and wrongful interference with American's economic advantage. Judge Duffy denied

American's motion for a preliminary injunction, finding American's legal remedy adequate. On April 2, 1987, CBS served its answer, which denied the existence of a contract and raised the affirmative defense of the Statute of Frauds. Following discovery, CBS filed motions on January 29 and on February 24, 1988 for summary judgment. CBS argued that the Browne–Horowitz meeting on November 22, 1985 did not produce a valid contract because the molds to be sold were never sufficiently identified and thus there was no meeting of the minds concerning the subject matter of the agreement.

A footnote to CBS's memorandum of law in support of its summary judgment motions stated:

> CBS and View–Master asserted as affirmative defenses that any oral agreement would be unenforceable under the statute of frauds, as a matter of law. Jones Aff.; Exs. B and D. Such an argument would require defendants to place additional legal arguments, facts and issues before the court and would not necessarily result in summary judgment on all claims. Defendants expressly reserve this defense at any trial which many [sic] occur in this case.

CBS concedes in its brief on appeal that CBS's "initial position"—presumably contained in the preceding block quotation—was that CBS was not basing its motion on the Statute of Frauds. In its memorandum of law opposing CBS's summary judgment motion, American asserted that "defendants are silent about Mr. Horowitz's written memorandum of that oral agreement [of November 22] and Mr. Browne's failure to dispute its accuracy as a confirmation of their agreement. See U.C.C., sections 2–201(2) and 2–207." CBS's reply memorandum in support of its motion for summary judgment contains over three pages of arguments against the applicability of § 2–201(2), which is an exception to the

Statute of Frauds and is paralleled by an identical provision in the New Jersey Statute of Frauds. Judge Duffy decided CBS's motion without oral argument.

On January 20, 1989, Judge Duffy granted summary judgment in favor of CBS, finding that there was insufficient evidence to conclude that American and CBS "had identified or agreed upon specific property to be purchased by" American. Judge Duffy also ruled that even if the parties had made an otherwise valid contract, the contract would be unenforceable under the Statute of Frauds. American had not responded to CBS's arguments regarding the Statute of Frauds. American now appeals this judgment, arguing first that the molds were sufficiently identified and that therefore there was a binding contract, and second that Judge Duffy ruled on the Statute of Frauds without allowing American the opportunity to address that issue.

## II

■ Resolving ambiguities and drawing reasonable inferences against the moving party, as we must on summary judgment, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Knight v. U.S. Fire Insurance Co., 804 F.2d 9, 11 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), we think that the evidence in the record shows a factual dispute as to whether the parties sufficiently identified the specific property to be purchased. Summary judgment was therefore inappropriate.

Judge Duffy's finding that New Jersey law applies to this case is not challenged. Since for the purposes of this appeal we assume that molds are goods,[3] Article 2 of the New Jersey version of the Uniform Commercial Code governs. Section 2–204(3) of the Code establishes a two-part test for determining whether a contract fails for indefiniteness:

---

3. Although Judge Duffy did not make any explicit finding on whether molds are goods, his opinion refers repeatedly to molds as goods. In addition, American argues that Article 2 of the Uniform Commercial Code governs this case. CBS does not here explicitly dispute this contention, though in opposing American's motion for a preliminary injunction CBS apparently argued that Article 2 is inapplicable (see Brief for Plaintiff–Appellant at n. 6). We therefore apply Article 2 for the purposes of this appeal.

Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

N.J.Stat.Ann. 12A:2–204(3) (West 1962).

### A

■ We believe there is sufficient evidence from which a jury could conclude that Browne and Horowitz intended to make a contract at the November 22, 1985 meeting. They set terms, including the price that Browne had originally insisted upon, and settled incidental property rights with the attention to detail characteristic of earnest negotiators. According to Horowitz, Browne asserted that a deal had been made and the two thereupon shook hands—a formality indicating intent to be bound. Arthur Taylor, a consultant for CBS who was present for the entire November 22 meeting, declared in an affidavit, "During that meeting CBS and American negotiated and concluded the sale of CBS's inactive molds to American." Despite CBS's protestations that both parties understood no agreement would be binding without CBS corporate approval, there is evidence to the contrary: Taylor declared, "To my recollection during this meeting I heard neither Boyd Browne nor Skip Marson condition the deal upon CBS corporate approval." At the meeting on January 9, 1986, Browne twice stated that Browne had informed View–Master of the American–CBS deal, thereby acknowledging that a deal had been voluntarily made. And according to Willenbrock's deposition, Marson similarly informed Willenbrock that a sale to American had taken place. In short, there is evidence that on November 22, 1985 both parties intended to be bound.

### B

Thus, the next issue is whether "there is a reasonably certain basis for giving an appropriate remedy." As stated above, the question is whether the parties sufficiently identified the molds to be sold, in which case there would be no difficulty in fashioning an appropriate remedy.

It is not disputed that on November 22, 1985 American made a bid on inactive molds. Yet CBS contends, and Judge Duffy implicitly held, that even if CBS had otherwise validly accepted the bid, the term "inactive" is too imprecise to permit determination of which molds were to go to American. We disagree.

■ There is evidence from which to conclude that "inactive" adequately identified the molds. The original computer list, supplied by CBS, classified molds as "active" and "inactive." Willenbrock, a CBS employee, deposed that CBS employees used those terms and that each term had a definite meaning: In his words, "Active meant in the production line. Inactive meant it was not in the production line or was not scheduled to be in a production line." Horowitz and Willenbrock each deposed that determining which molds were inactive was a "mechanical" task; Browne deposed that from the computer printout "it would be easy to identify" which molds were active and which inactive. Both sides used the terms, indicating common knowledge of what was meant by the terms as used in the agreement. In addition, the parties' agreement on a specific price for all the molds to be sold, payment terms, delivery and samples to be supplied suggests that they knew which and how many molds they were contracting for.

The fact that CBS never supplied American with the list of inactive molds called "Schedule A" is not conclusive evidence that the parties did not know exactly which goods were to be sold. A jury could reasonably find that a contract existed despite the absence of a document listing the goods; CBS cannot escape liability by claiming that its failure to provide an updated list of "inactive molds" meant that there was no agreement on specific property. Moreover, Horowitz's confirmation letter dated November 25 shows that the molds to be sold were not only those on Schedule A but also "others." The agreement of November 22 was not necessarily contingent upon the preparation of a list of specified molds.

In addition, American asserts, in direct contradiction of CBS's position, that after the November 22 meeting American did

send CBS a Schedule A. This amounts to a dispute as to whether the computer list as edited by Horowitz to show only inactive molds constituted Schedule A; whether it was actually labeled "Schedule A" is unclear. From the evidence American submitted on the issue, a jury could conclude that a specific list of molds was readily compilable and had actually been sent to CBS by Horowitz and thus that the subject matter of the agreement was sufficiently identified.[4]

### III

The record does not establish a basis for the district court's alternative holding that the alleged agreement was invalid under the New Jersey Statute of Frauds. There are factual disputes concerning whether CBS is a merchant under the "merchants' exception" to the Statute of Frauds and whether American sent CBS a proper confirmation. The district court did not give American sufficient opportunity to address this issue.

### A

■ Although CBS's answer to the complaint raised the Statute of Frauds defense, CBS's memorandum in support of its summary judgment motion somewhat equivocally disavowed reliance on the Statute of Frauds. American had reason to believe that CBS was not basing its motion on that defense. American's memorandum opposing the summary judgment motion thus devoted only one sentence and a "see" citation to the issue. American was justified in believing that there was no need to respond at that time to the applicability of § 2–201(2). However, in its reply brief, CBS finally made a lengthy argument concerning the Statute of Frauds. Thus, when the district court decided the motion without oral argument, American had had no opportunity to respond to CBS's belated development of the Statute of Frauds defense. American should be given the opportunity to address the applicability of the Statute of Frauds.

### B

American asserts on appeal that the Statute of Frauds does not apply to the alleged agreement because CBS and American are "merchants." The Statute of Frauds specifically excepts oral agreements between merchants if there is a written confirmation within a reasonable time, unless the party receiving the confirmation objects in writing within ten days after receipt. Subsection (1) of § 2–201 of the Code requires a writing to prove the sale of goods for $500 or more, and subsection (2), known as the "merchants' exception," provides:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten. days after it is received.

N.J.Stat.Ann. 12A:2–201(2) (West 1962). In other words, if merchants A and B orally agree to a sale of goods for $500 or more, and merchant A within a reasonable time sends merchant B a written confirmation of the contract, Merchant B would lose the Statute of Frauds defense unless Merchant B gives a written objection within ten days after receiving the confirmation.

Here it is undisputed that American was a merchant, that American's letter dated November 25 was sent within a reasonable time after the November 22 meeting, that CBS received the letter on November 28 and that CBS did not make any written response until more than ten days after November 28.

At the same time, American disputes CBS's claim that CBS was not a merchant. In support of this position, American cites on appeal the definition of "merchant" in the Uniform Commercial Code and the official comment thereto:

> "Merchant" means a person who deals in goods of the kind *or otherwise by his occupation holds himself out as having*

---

**4.** CBS directs our attention to the letter of intent, which Horowitz signed on December 18, 1985—as a result, American alleges, of CBS's fraudulent representations. The letter of intent, however, does not necessarily determine whether the November 22 meeting resulted in a contract, and we therefore need not discuss it.

*knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.*

N.J.Stat.Ann. 12A:2–104(1) (West 1962) (emphasis supplied). Comment 2 explains: Sections 2–201(2), 2–205, 2–207 and 2–209 dealing with the statute of frauds, firm offers, confirmatory memoranda and modification rest on normal business practices which are or ought to be typical of and familiar to any person in business. For purposes of these sections *almost every person in business would, therefore, be deemed to be a "merchant"* under the language "who ... by his occupation holds himself out as having knowledge or skill peculiar to the practices ... involved in the transaction..[.]" *since the practices involved in the transaction are non-specialized business practices such as answering mail.* In this type of provision, banks or even universities, for example, well may be "merchants."

N.J.Stat.Ann. 12A:2–104, Uniform Commercial Code Comment 2 (West 1962) (emphasis supplied). American argues that the Code and Comment indicate "merchant" is to be broadly defined to include almost anyone in business and that therefore CBS is a merchant, citing *County of Milwaukee v. Northrop Data Systems, Inc.,* 602 F.2d 767 (7th Cir.1979); *Cement Asbestos Products Co. v. Hartford Accident and Indemnity Co.,* 592 F.2d 1144 (10th Cir.1979); and *Pecker Iron Works, Inc. v. Sturdy Concrete Co.,* 96 Misc.2d 998, 410 N.Y.S.2d 251 (Civ.Ct. Queens Cty. 1978).

CBS cites three cases that purport to define "merchant."[5] However, none is on point because each concerns the definition of "merchant" as the term is used in a different section, § 2–314, which provides for the implied warranty of merchantability. As Comment 2 to § 2–104 makes clear,

"merchant" is defined much more narrowly under § 2–314 than under § 2–201(2):

On the other hand, in Section 2–314 on the warranty of merchantability, such warranty is implied only "if the seller is a merchant with respect to goods of that kind." [§ 2–314] *Obviously this qualification restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods.*

N.J.Stat.Ann. 12A:2–104, Uniform Commercial Code Comment 2 (West 1962) (emphasis supplied). Since American claims that CBS failed to respond as § 2–201(2) directs, and not that CBS failed to provide merchantable goods as § 2–314 directs, CBS's cases under § 2–314 are irrelevant.

■ Surely no jury would have any difficulty concluding that CBS is in business and that CBS held itself out as having sufficient familiarity with the postal system and the answering of mail to be considered a merchant under § 2–201(2). Indeed, Comment 2, in mentioning "non-specialized business practices such as answering mail," refers to circumstances similar to those in this case.

We additionally note that Comment 3, which explains the last third of the definition of "merchant" (reading "or to whom such knowledge may by attributed...."), also applies to this case, for Comment 3 defines a "merchant" as anyone who has "business personnel who are familiar with business practices and who are equipped to take any action required." The record shows that CBS had such personnel in Browne and his staff.

It is enough to say that the asserted application of the Statute of Frauds to defeat American's claim raised unresolved issues which can be determined only after further development and argument.

## IV

We agree with the district court's denial of sanctions, sought by CBS, and find no

---

5. *Olson v. U.S. Industries, Inc.,* 649 F.Supp. 1511 (D.Kan.1986); *Bevard v. Ajax Manufacturing Co.,* 473 F.Supp. 35 (E.D.Mich.1979); *Kates Millinery Ltd. v. Benay-Albee Corp.,* 114 Misc.2d 230, 450 N.Y.S.2d 975 (Civ.Ct. Queens Cty. 1982), *aff'd,* 120 Misc.2d 429, 467 N.Y.S.2d 348 (App. Term 2d Dept. 1983).

reason to impose any sanctions on this appeal.

Reversed and remanded for further proceedings consistent with this opinion.