**BANQUE PARIBAS**

v.

**Jeanne–Marie DANA, a/k/a Jeanne Peters, a/k/a J. Martin Dana, a/k/a Patricia Delafield, and a/k/a Mrs. Ashton Sloane**

**and**

**Connaught Properties, Inc.**

**Civ. No. B–89–126 (JAC).**

United States District Court,
D. Connecticut.

Nov. 13, 1990.

---

**524**

J. Portis Hicks (Boulanger Finley & Hicks), New York City, for plaintiff.

J. Daniel Sagarin (Hurwitz & Sagarin), Milford, Conn., for defendant Jeanne–Marie Dana.

## RULING ON RENEWED MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

Pending before the court is Plaintiff's Renewed Motion for Summary Judgment (filed July 24, 1990) against the individual defendant Jeanne–Marie Dana which would render judgment in favor of the plaintiff on the first three counts of the Complaint (filed Mar. 15, 1989).

### I. BACKGROUND

On May 2, 1990, I denied plaintiff's original motion for summary judgment without prejudice to renewal upon a more complete record and upon the completion of discovery. Since then, the parties have conducted further discovery and submitted supplemental affidavits and memoranda. At oral argument on October 12, 1990, both counsel assured the court that discovery in this case was now complete and that Plaintiff's Renewed Motion for Summary Judgment was ripe for decision.

The following facts are not in dispute: On June 26, 1979, Banque Paribas ("Paribas") entered into a written agreement with Jeanne–Marie Dana, a corporate finance advisor and principal employee of The Dana Group International, Inc. (the "Dana Group"), who was interested in expanding her financial services into Europe for her American clients. *See* Complaint, Exhibit B (English version of agreement). This agreement was between the bank and Ms. Dana personally. According to the terms of that agreement, which is to be governed by French law, Paribas agreed to loan $250,000 to Ms. Dana to help finance her European operations, and this loan was to be repaid in eight annual installments at an interest rate of 10%, commencing on June 30, 1982, three years after the date of the agreement. The parties also agreed that, whenever possible, Ms. Dana would introduce her American clients in need of financial services in Europe to Paribas. According to the agreement, Paribas would have the option to make a second loan of $250,000 in 1980 if the relationship between Paribas and Ms. Dana were to prove "satisfactory." Whether or not Paribas would make the second loan would depend on the amount of fees and commissions received from clients who were referred to Paribas by Ms. Dana. In fact, on June 4, 1980, an additional $250,000 was loaned to Ms. Dana.

The characterization of the business relationship between Paribas and Ms. Dana is the principal issue in dispute in this case. According to plaintiff, the relationship was simply one of a lender and a borrower. Because Ms. Dana repaid only $93,750 in principal and $148,914.92 in interest on the loans totalling $500,000, plaintiff claims that defendant has been in default since June 1984.

Defendant argues, however, that the purported loans were not in fact loans at all, but rather an agreed compensation package that was part of a larger business relationship between Ms. Dana and Paribas. The bank, according to Ms. Dana, structured the arrangement as a loan for reasons of its own (allegedly to avoid hav-

ing to comply with certain French banking regulations), but it was agreed and understood by both parties that Ms. Dana would not be required to repay the money to Paribas. Ms. Dana argues further that the commissions and fees received by Paribas as a result of her referral efforts were understood to offset the amount owing on the "loans" and that, because of the substantial fees and commissions received by Paribas, her obligations have been satisfied. She claims that both parties knew that the June 26, 1979 loan agreement did not reflect the entire agreement between the parties, and she further alleges that it was Paribas that broke off the business relationship with the Dana Group when President François Mitterand's socialist government nationalized Paribas and other banks. At a minimum, defendant argues that the dispute about the content and meaning of the contract presents a genuine issue of material fact which would make inappropriate the granting of summary judgment on the record as it now stands.

## II. DISCUSSION

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire In-*

*surance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Finally, mere conclusory allegations and denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

By its very terms, the June 26, 1979 loan agreement is to be construed according to French law, and neither party disputes that French law governs the contract. Indeed, both parties have submitted affidavits from French lawyers concerning the applicability of relevant principles of French substantive law. The question now before the court is clear: Does Ms. Dana's claim of an oral understanding that she would not have to repay a loan made in accordance with the specific terms of a written agreement raise a genuine issue of material fact?

The parol evidence rule is traditionally defined as follows:

When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

3 A. Corbin, *Corbin on Contracts* § 573, at 357 (1960); *see also Battery Steamship Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 (2d Cir.1975) (referring to this passage as "classic statement of the parol evidence rule"). This rule is also expressed in Section 2–202 of the Uniform Commercial Code:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of

any prior agreement or of a contemporaneous oral agreement....

Conn.Gen.Stat.Ann. § 42a–2–202 (West 1990).

 In most jurisdictions, the question of "integration" is a question of fact. *Battery Steamship Corp.* 513 F.2d at 738 n.3 (citing Corbin, *The Parol Evidence Rule,* 53 Yale L.J. 603 (1944)). Although the writing may appear to be complete on its face, such appearance is only evidence of intent; it does not establish as a matter of law that the agreement is integrated. *See* A. Corbin, *supra,* at 360; *Battery Steamship Corp.,* 513 F.2d at 739. The parol evidence rule only comes into play once it is clear that the parties intended their written agreement to be a complete integration. In other words, any evidence may be admitted that speaks to the question of whether or not the agreement was a "complete and accurate integration" of the contract. This would appear to be the rule in France as well. *See* Declaration of Denis Debost (*Avocat au Barreau de Paris* and defendant's "expert" on French law) (filed Apr. 30, 1990), ¶¶ 4–5, at 2.

A. *The Loan Agreement and the Overall Business Relationship*

 Was the June 29, 1979 loan agreement a "complete and accurate integration" of the contract? Ms. Dana offers several items of evidence to suggest that it was not. First, there is a letter received by Ms. Dana from Pierre Haas, who in 1979 was Paribas' Senior Executive Vice President in charge of the international financial transactions department, in which he "enlarges on some of the points of our working agreement which cannot be reflected in a loan agreement." Affidavit of Jeanne–Marie Dana in Opposition to Plaintiff's Motion for Summary Judgment (filed Feb. 7, 1990) ("Dana Affidavit"), Exhibit E. He then proceeds to detail the fees and commissions that would be paid to "the Dana Group European Entity" for each kind of transaction (*e.g.,* an international credit, a stock listing, etc.) that Paribas enters into with one of the Dana Group's clients.

Ms. Dana claims that this letter "is an admission that the loan agreement is not a complete agreement." Defendant Jeanne–Marie Dana's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (filed Feb. 7, 1990) ("Dana's Memorandum") at 4. But the letter suggests only that the details of the various commission arrangements between Paribas and the Dana Group would not be reflected in a loan agreement between Paribas and Ms. Dana. According to the bank, "the commission payments by Paribas to the Dana Group were made pursuant to a separate arrangement between Paribas and the Dana Group.... [T]hat arrangement was never actually made the subject of a formal written agreement...." Plaintiff's Supplemental Memorandum of Law (filed Aug. 27, 1990) at 15. There is no evidence that the loan agreement between Ms. Dana and Paribas was to have anything to do with the payment of commissions to the Dana Group. The only aspect of the loan to which the commissions were relevant was whether or not Ms. Dana would receive the additional $250,000 loan in 1980. *See* Reply Declaration of Pierre Haas in Support of Motion for Summary Judgment (filed Mar. 13, 1990), ¶ 13, at 11. The fact that the commissions were to be made to the Dana Group while the loan was to be made to Ms. Dana personally further suggests that the two transactions were always intended to be treated separately.

The second item of evidence which Ms. Dana offers to suggest that the loan agreement was part of a larger business relationship is a draft of the letter agreement on management fees sent by Paribas to Ms. Dana on June 23, 1979. Dana Affidavit, Exhibit H. This draft agreement is a more formal elaboration of the terms presented in the Haas letter of June 14, 1979, *see* Dana Affidavit, Exhibit E. Despite Ms. Dana's claim that this draft agreement meant that "these fees would offset amounts due under the loan, provided that Paribas was satisfied with the amount of business it received," Dana Affidavit, ¶ 8, at 4, there is no evidence other than Ms. Dana's self-serving recollection that this was the understanding of the parties. She claims that "[i]t was mutually agreed for political and internal purposes

of Paribas that the arrangement outlined in the ... draft documents would not be formalized, at Paribas' request," *id.*, ¶ 7, at 4. Yet, it is hardly believable that Ms. Dana, a sophisticated and experienced business person, as well as the firm of Cravath, Swaine & Moore, her counsel throughout the negotiations, would have permitted such an unusual arrangement to proceed without any written record of the parties' "intent." The only reasonable conclusion is that the loan to Ms. Dana and the commission arrangement with the Dana Group were intended to be separate contracts. The loan agreement of June 29, 1979 was a "complete and accurate integration" of the transaction it describes; to accept defendant's description of the loan as simply a part of a larger business relationship would be to "rely on mere speculation or conjecture as to the true nature of the facts," *Knight*, 804 F.2d at 12, and that would not be sufficient to defeat a motion for summary judgment.

### B. *Estoppel and Laches*

Ms. Dana argues as an affirmative defense that, even if the loan agreement is held *not* to be part of an overall business arrangement, "the loan agreement was either procured by fraud or entered into by mistake." Dana's Memorandum at 14. According to the uncontradicted affidavit of Bernard de Bigault du Granrut, an *Avocat au Barreau de Paris, Ancien Batonnier* and Paribas' "expert" on French law, the doctrine of equitable estoppel does not exist under French law. *See* Affidavit of J. Portis Hicks in Support of Motion for Summary Judgment (filed Dec. 28, 1989), Declaration of Bernard de Bigault du Granrut, A French Attorney, ¶ 5, at 4. The closest equivalent in French law is the doctrine of *vices du consentement* which provides that "[t]here is no valid consent if such consent has been given by mistake, or extorted with force or obtained by fraud." *Id.*, ¶ 6, at 5. Ms. Dana has offered no evidence that she was the victim of fraud.

■ Under American law—and neither party has suggested that French law is different on this point—to invoke the doc-

trine of mistake, it is not sufficient merely for one party to assert that it thought the contract was about something different from that claimed by the other party. "It has never been asserted, and it is not being asserted here, that a party ever makes out a sufficient case for relief, either affirmative or defensive, by merely proving that [she] was caused to execute a deed or to make a promise by the fact that [she] had a mistaken thought." A. Corbin, *supra*, § 608, at 677. The Restatement (Second) of Contracts specifies that a mistake of one party can make a contract voidable only if "(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." Restatement (Second) of Contracts § 153 (1979). Neither of these conditions holds true in this case. Reformation of the contract should be denied if the understanding of one party was reasonable and that of the other was unreasonable. A. Corbin, *supra*, § 608, at 678. Under the facts of this case, even if Ms. Dana mistakenly believed that she had no obligation to repay the loans, there is no genuine issue as to any fact that would make her belief reasonable.

■ Ms. Dana claims further that Paribas is not entitled to judgment as a matter of law because, under the French equivalent of laches, Paribas' alleged termination of the business relationship with the Dana Group (the direct result, according to Ms. Dana, of its socialist banking policies) was wrongful and caused injury to the defendant. According to the uncontradicted affidavit of M. du Granrut, French law has no equivalent to the doctrine of laches. The defendant might have a damages claim against the plaintiff if it can prove that the plaintiff's actions caused the defendant some injury, but even if Ms. Dana had such a claim—a theory that no reasonable interpretation of the facts could support—it would still not bar Paribas' right to recover against Ms. Dana under the express terms of the agreement. *See* Reply Declaration of Bernard de Bigault du Granrut (filed Mar. 13, 1990), ¶ 6, at 4.

**528**

### C. *Accord and Satisfaction*

The final affirmative defense is Ms. Dana's claim that there was an accord and satisfaction whereby the services rendered by Ms. Dana discharged any obligations she arguably assumed under the loan agreement. In her memorandum of law in opposition to the original motion for summary judgment, Ms. Dana conceded that French law requires a "presentment of proof" in order to discharge a debt by subsequent services, and she requested the opportunity to complete discovery on this issue. *See* Dana's Memorandum at 18. I denied the original motion for summary judgment in order to allow the defendant the opportunity to pursue further discovery, at least in part so that she might make a more convincing "presentment of proof" on the issue of accord and satisfaction.

After securing an order under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 847 U.N.T.S. 231, 28 U.S.C. § 1781 note, to take the deposition of Pierre Haas —plaintiff's principal witness—Ms. Dana decided not to depose him. None of the exhibits attached to her subsequent memorandum provides any support for her claim that there was an accord and satisfaction of the loan agreement by a subsequent agreement. The one reference to making the loan "in exchange" for Ms. Dana's bringing in American clients occurs in an internal memorandum from Pierre Moussa, the President of Paribas. *See* Supplemental Memorandum of Jeanne–Marie Dana in Opposition to Plaintiff's Motion for Summary Judgment (filed Aug. 6, 1990), Exhibit A. It is clear from the context of the memorandum, however, that Mr. Moussa's memorandum antedates the June 29, 1979 agreement and that this document suggests nothing about an accord and satisfaction of the loan agreement. Ms. Dana has failed to make "a showing sufficient to establish the existence of an element essential to [her] case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and summary judgment is appropriate.

### III. CONCLUSION

For the reasons stated above, Plaintiff's Renewed Motion for Summary Judgment (filed July 24, 1990) is GRANTED, and judgment shall enter for the plaintiff on Counts one, two, and three of the Complaint.

It is so ordered.